In re WINGSPREAD CORPORATION, et al., Debtors.

Harold YOUNG, as Trustee of Wingspread Corporation, and its subsidiaries, Debtors, Plaintiff,

v.

PARAMOUNT COMMUNICATIONS INC., f/k/a Gulf & Western Industries Inc., Kayser–Roth Corporation, Norman Hinerfeld and NCNB National Bank as successor to NCNB Financial Services, Inc., Defendants.

Bankruptcy Nos. 87 B 10618(TLB) to 87 B 10630(TLB).
Adv. No. 90–6406A(JHG).

United States Bankruptcy Court, S.D. New York.

Jan. 5, 1995.

Friedman & Kaplan by Bruce S. Kaplan and Andrew W. Goldwater, New York City, for Paramount and Kayser–Roth.

Wachtell, Lipton, Rosen & Katz by Eric M. Roth, New York City, for Nationsbank of North Carolina.

Hahn & Hessen by John P. McCahey and Joseph A. Vogel, New York City, for Harold Young, Chapter 7 Trustee.

## *DECISION ON MOTION AND CROSS-MOTION FOR SUMMARY JUDGMENT*

JEFFRY H. GALLET, Bankruptcy Judge.

### INTRODUCTION

This adversary proceeding was commenced by Harold Young ("Young" or "Trustee"), Chapter 7 Trustee of Wingspread Corporation ("Wingspread" or the "Debtor"), against Paramount Communications, Inc. ("Paramount"), Norman M. Hinerfeld ("Hinerfeld"),

1. NCNB is now known as Nationsbank of North Carolina.

2. Subject matter jurisdiction arises under 28 U.S.C. § 1334(b) and the "Standing Order of Referral of Cases to Bankruptcy Judges" of the

NCNB National Bank ("NCNB")[1] and Kayser–Roth Corporation ("Kayser–Roth") to set aside elements of a management-led buyout of six divisions of Kayser–Roth on the grounds that the buyout constituted a fraudulent conveyance.[2] Kayser–Roth, Paramount and Nationsbank of North Carolina (collectively the "Defendants") have moved for summary judgment on two grounds. The first is that the Trustee is time barred from bringing this proceeding because the two-year statute of limitations has run. The second is that the Trustee lacks standing to bring this proceeding because he has not established the existence of a specific unsecured creditor who would have standing to bring it. 11 U.S.C. 544(b). The Trustee has cross moved for summary judgment.

### FACTS

This motion concerns the 1985 management buyout of six divisions of Kayser–Roth. In 1975, Gulf & Western Industries, Inc. (later known as Paramount) acquired Kayser–Roth. Hinerfeld, who had been President and Chief Executive Officer of Kayser–Roth, became Chairman of its Executive Committee.

In the fall of 1984, Hinerfeld approached James Spiegal, then the President Gulf & Western's Consumer and Industrial Products Group, regarding the possible purchase of all or part of Kayser–Roth. Hinerfeld then hired an investment banker to assist him in formulating, negotiating and financing the buyout.

On March 6, 1985, Hinerfeld and Kayser–Roth signed a letter of intent, subject to a formal agreement, under which Wingspread, a new corporation controlled by Hinerfeld, would buy six Kayser–Roth divisions.

On June 20, 1985, a purchase agreement, which set May 25, 1985 as the date by which the risk of operations shifted from the seller to the buyer, was signed. The purchase price was the sellers' net investment, as de-

United States District Court for the Southern District of New York, dated July 10, 1984 (Ward, Acting C.J.). This is a core matter under 28 U.S.C. § 157(b)(2)(A).

termined by the May 25, 1985 balance sheet, less a discount of $12 million.

NCNB provided the financing for the buy-out. It agreed to advance Wingspread up to $8 million, pursuant to factoring agreements on accounts receivable, and to provide a term loan of $3.8 million, which would be secured by a first security interest on the assets of Wingspread and its new subsidiaries.

On July 3, 1985, the transaction closed. At the closing, Wingspread authorized Kayser–Roth to receive the following consideration. First, NCNB was authorized to wire transfer (the "Wire Transfer") $12 million to Kayser–Roth, which it did. Second, Kayser–Roth received a $3.44 million promissory note (the "Promissory Note") which had its first payment of principal due in July 1989 and the balance payable in installments over the next seven years. Finally, Kayser–Roth received 33,000 shares of preferred stock (the "Preferred Stock") in Wingspread, which had an aggregate redemption value of $1,650,000.[3]

About two years later, Wingspread began to suffer financial difficulties and, on April 6, 1987, Wingspread and its subsidiaries filed bankruptcy petitions under chapter 11. On October 3, 1988, the cases were converted to chapter 7. On October 4, 1988, Young was appointed Trustee.

On September 27, 1990, the Trustee brought this proceeding to avoid certain elements of the buyout, including the Wire Transfer, the Promissory Note and the issuance of the Preferred Stock, as being fraudulent conveyances. At the time of the filing, no principal payments had been made on the Promissory Note, nor had any Preferred Stock been redeemed. The Trustee's complaint, which alleged that the Wire Transfer was constructively fraudulent with respect to creditors of "Wingspread and/or its subsidiaries" under Sections 4, 5 and 6 of New York's version of the Uniform Fraudulent Conveyance Act ("UFCA") (N.Y. Debtor and Creditor Law §§ 273, 274, 275), did not identify any particular creditor of Wingspread who would have such a cause of action. Rather, it alleged the existence of otherwise unidentified pre-buyout creditors. After the Trustee filed his action, Paramount served interrogatories asking the Trustee to identify the creditors alleged in the complaint. The Trustee identified "(i) those unsecured creditors included in the Debtors' schedules of unsecured creditors; and (ii) those unsecured creditors listed on Debtors' unsecured creditors registers." Those schedules and registers list nearly 2,000 unsecured claims. In addition, the Trustee listed the following creditors. (the "Listed Creditors"):

1. (a) Upon consummation of the closing, the unsecured creditors of Wingspread and/or its subsidiaries included but was not limited to the following:

(i) Trade creditors of Kayser–Roth Corporation and or its subsidiaries and affiliates to the extent such obligations were assumed by Wingspread and/or its subsidiaries;

(ii) Norman Hinerfeld—$28,000 principal due under a promissory note dated July 3, 1985 as well as accrued pension compensation;

(iii) Claims for accrued severance payments for a number of employees, including but not limited to; Renee Champ, Walter Klinick, Janice Walker, Dorothy Maley, Jerome Brotman, Delores Melton and Harold Ornstein;

(iv) The City of New York—owed accrued Commercial Rent Occupancy Tax for period 6/1/83–4/6/87 and accrued N.Y.C. General Corporation Tax for period 1/1/84–4/6/87;

(v) Taffeta Co. of America—trade creditor owed $495.00 under unpaid invoice dated June 11, 1985;

(vi) ILGWU National Retirement Fund—owed ERISA withdrawal liability for contributions from 1975 through 1985;

(vii) Pandora Sportswear Inc. Pension Plan—owed ERISA liability for unfunded pension liability;

(viii) Lambert C. Thom, Trustee of BDRD & T Retirement Trust—promissory

---

**3.** Ultimately, however, none of the payments were made on the Promissory Note and the Preferred Stock was never redeemed for any value.

The Trustee seeks only to recover the $12 million Wire Transfer.

note in the amount of $40,000, dated July 1, 1985 ...;

and

(ix) Dexter Dawes—$10,000 owed for consulting services rendered prior to the acquisition.

## LAW

### A. Standard for Summary Judgment

Both the Defendants and the Trustee have moved for summary judgment under Federal Rule of Civil Procedure 56, which is made applicable to this proceeding by Bankruptcy Rule 7056. Summary judgment is appropriate if the court determines that the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law. *Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986); *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247–48, 106 S.Ct. 2505, 2509–10, 91 L.Ed.2d 202 (1986); *In re Ionosphere Clubs, Inc.,* 147 B.R. 855, 866 (Bankr.S.D.N.Y.1992). In considering a motion for summary judgment, "the court's responsibility is not to resolve disputed issues of fact but to assess whether there are any factual issues to be tried, while resolving ambiguities and drawing reasonable inferences against the moving party." *Cartier v. Lussier,* 955 F.2d 841, 845 (2d Cir.1992); *Knight v. U.S. Fire Insurance Co.,* 804 F.2d 9, 11 (2d Cir.1986), *cert. denied,* 480 U.S. 932, 107 S.Ct. 1570, 94 L.Ed.2d 762 (1987). In fact, the allegations of the non-movant are to be taken as true and are to be given the benefit of doubt when they conflict with those of the movant. *Cruden v. Bank of New York,* 957 F.2d 961, 975 (2d Cir.1992); *Taggart v. Time Inc.,* 924 F.2d 43, 46 (2d Cir.1991); *Burtnieks v. City of New York,* 716 F.2d 982, 985–86 (2d Cir.1983).

The moving party initially bears the burden of establishing the absence of a genuine issue as to any material fact. *Celotex Corp. v. Catrett,* 477 U.S. at 322–23, 106 S.Ct. at 2552–53; *Adickes v. S.H. Kress & Co.,* 398 U.S. 144, 157, 90 S.Ct. 1598, 1608, 26 L.Ed.2d 142 (1970); *In re Ionosphere Clubs, Inc.,* 147 B.R. at 861. That burden can be satisfied by demonstrating the absence of evidence supporting the non-movant's case. *Celotex Corp. v. Catrett,* 477 U.S. at 325, 106 S.Ct. at 2554. When a motion for summary judgment is made and supported by the movant, Rule 56(e) requires the non-moving party to set forth specific facts demonstrating that genuine issues of material fact remain for trial. *Matsushita Elec. Industrial Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 586–87, 106 S.Ct. 1348, 1355–56, 89 L.Ed.2d 538 (1986). The non-moving party may not defeat a properly supported motion for summary judgment by relying on self-serving and conclusory statements concerning the true nature of the facts. *Wyler v. United States,* 725 F.2d 156, 160 (2d Cir.1983). As the Supreme Court has noted, the non-moving party must do more than simply show that there is some metaphysical doubt as to the material facts. *Matsushita Elec. Industrial Co. v. Zenith Radio,* 475 U.S. at 586, 106 S.Ct. at 1355–56; *cf. In re Ionosphere Clubs, Inc.,* 147 B.R. at 861.

### B. Statute of Limitations under 11 U.S.C. § 546(a)

The facts surrounding the statute of limitations issue are not in dispute. The Trustee filed his adversary proceeding more than two years after the Debtor filed its petition for relief under chapter 11, but less than two years after the case was converted to chapter 7 and he was appointed Trustee. The Defendants argue that under 11 U.S.C. § 546(a)[4] the two year limitation period began to run at the time the Debtor filed its petition under chapter 11 and since the Trustee commenced this adversary proceeding almost three and one half years after that date, he is time barred.

In support of their argument, the Defendants rely on the Second Circuit's decision in *U.S. Brass and Copper Co. v. Caplan (In re*

---

4. 11 U.S.C. § 546(a) provides in pertinent part:
 (a) An action or proceeding under section 544, 545, 547, 548, or 553 of this title may not be commenced after the earlier of ...

 (1) two years after the appointment of a trustee under section 702, 1104, 1163, 1302, or 1202 of this title; or
 (2) the time the case is closed or dismissed.

*Century Brass Products, Inc.),* 22 F.3d 37 (2d Cir.1994) which held that the two year statute of limitations period of Section 546(a) applied to Debtors–in–Possession ("DIPs") as de facto trustees,[5] as well as the decisions of the Tenth, Ninth and Third Circuits to the same effect. *See Construction Mgt. Services v. Manufacturers Hanover Trust (In re Coastal Group Inc.),* 13 F.3d 81 (3d Cir. 1994); *Upgrade Corp. v. Gov't Technology Services (In re Softwaire Centre International, Inc.),* 994 F.2d 682 (9th Cir.1993); and *Zilkha Energy Co. v. Leighton,* 920 F.2d 1520 (10th Cir.1990).

The *Century Brass* court addressed the issue of whether the limitations period of Section 546(a) applied to a DIP. In *Century Brass,* no bankruptcy trustee had been appointed. The case was filed March 15, 1985, and in September 1989, the Bankruptcy Court confirmed a chapter 11 liquidating plan. A plan administrator was appointed, and approximately one year later, the administrator commenced an action to avoid a preferential transfer. The defendant objected on the grounds that pursuant to Section 546(a), the action was time barred. Although both the Bankruptcy and District Courts found that the action was not time barred, the Second Circuit reversed and found that the statute of limitations begins to run for the DIP upon commencement of the case. In deciding that the limitations period applies to a DIP, the Second Circuit joined three other Circuits which had already decided the issue. *Construction Mgt. Services v. Manufacturers Hanover Trust (In re Coastal Group Inc.),* 13 F.3d 81 (3d Cir.1994); *Upgrade Corp. v. Gov't Technology Services (In re Softwaire Centre International, Inc.),* 994 F.2d 682 (9th Cir.1993); and *Zilkha Energy Co. v. Leighton,* 920 F.2d 1520 (10th Cir.1990) *But See Maurice Sporting Goods, Inc. v. Maxway Corp. (In re Maxway Corp.),* 27 F.3d 980 (4th Cir.1994), *cert. denied,* — U.S. ——,

115 S.Ct. 580, 130 L.Ed.2d 495 (1994) (Holding that the two year statute of limitation only begins to run upon appointment of a trustee under one of the enumerated sections of Section 546(a)). However, none of the cases finding that Section 546(a) applied to DIPs, addressed the issue before me, which is whether the statute of limitations begins to run anew upon appointment of the first trustee under one of the code sections enumerated in Section 546(a).

In reaching the decision that the two year period applied to DIPs, the Second Circuit noted that under Section 1107(a) of the Code, a functional equivalent exists between the trustee and DIP.[6] Applying the statutory framework, the Second Circuit reasoned that the language of Section 1107(a) "plainly allows a DIP to exercise the same power a trustee would have to bring a preference avoidance action.... Accordingly, we read § 1107(a)'s authorization for a DIP to act 'subject to any limitations on a trustee' to mean that the statute of limitations applicable to a trustee also applies to a DIP." *In re Century Brass Products, Inc.,* 22 F.3d 37, 39 (2d Cir.1994).

The court in *Century Brass* was dealing with a set of facts distinguishable from those here. The issue of whether the statute of limitations of 546(a) applies to a DIP is separate from whether the statute of limitations begins to run anew once a chapter 11 case has been converted to one under chapter 7, and a chapter 7 trustee has been appointed. The *Century Brass* court recognized that difference and specifically declined to address the trustee issue saying:

"Century's additional argument that subjection of a DIP to 546(a)'s two-year statute of limitations would create an anomaly if a bankruptcy trustee were appointed more than two years after the petition was filed is an interesting one.... However, since no trustee was ever appointed in the

---

5. Subsequent to its decision in *Century Brass,* the Second Circuit reached the same conclusion in *United States Lines (S.A.), Inc., v. U.S. (In re McLean Indus., Inc.),* 30 F.3d 385 (2d Cir.1994).

6. Section 1107(a) reads:
 (a) Subject to any limitations on a trustee serving in a case under this chapter, and to such limitations or conditions as the court pre-

scribes, a debtor in possession shall have all the rights, other than the right to compensation under section 330 of this title, and powers, and shall perform all the functions and duties, except the duties specified in sections 1106(a)(2), (3) and (4) of this title, of a trustee serving in a case under this chapter.

present case, we need not decide whether such an appointment might revive a claim that the DIP itself would have been barred from bringing."

*Id.,* at 41.

The *Zilkha* court also declined to address the same issue stating:

"We take no position on whether a subsequent appointment of a trustee in a chapter 11 case would change the analysis.... While we perceive that to be a distinguishable circumstance requiring a different analysis, we leave the issue for a case in which that situation arises."

*In re Zilkha Energy Co.,* 920 F.2d 1520, 1524 (10th Cir.1990).

The interpretation that the defendants urge is akin to all apples are fruit therefore all fruits are apples. That is, since all DIPs are trustees, therefore all trustees are DIPs. The Defendants would then be arguing that section 1107(a) should be construed as implying that the trustee is the "functional equivalent" of a DIP. *Nigro v. Pittsburgh Post–Gazette (In re The Appliance Store, Inc.),* 171 B.R. 525 (Bankr.W.D.Pa.1994). This is an interpretation I am not willing to embrace.

 In interpreting the language of Section 546(a), I am "guided by the fundamental canon that statutory interpretation begins with the statute itself." *Pennsylvania Dept. of Pub. Welfare v. Davenport,* 495 U.S. 552, 557–58, 110 S.Ct. 2126, 2130, 109 L.Ed.2d 588 (1990) (*citing Landreth Timber Co. v. Landreth,* 471 U.S. 681, 685, 105 S.Ct. 2297, 2301, 85 L.Ed.2d 692 (1985)); *French v. F.A. Kohler Co. (In re Fisher),* 162 B.R. 474, 476 (Bankr.N.D.Ohio 1993). A court will depart from the literal meaning of a statute only where "the literal application of a statute will produce a result demonstrably at odds with the intentions of its drafters."

*U.S. v. Ron Pair Enterprises, Inc.,* 489 U.S. 235, 242, 109 S.Ct. 1026, 1031, 103 L.Ed.2d 290 (1989). I see no reason to depart from the literal meaning of Section 546(a), nor how a literal application of the statute would produce a result "demonstrably at odds with the intentions of the drafters." *Id.* Most other courts dealing with the question of when the statute of limitations starts to run have held that the trustee is governed by the plain meaning of the statute, which states that an action may be commenced "two years after the appointment of a trustee under section 702...." 11 U.S.C. § 546(a).[7]

I am persuaded that the plain language of the statute should govern the outcome in this case and see no reason to diverge from Congress' clear language. "[T]he most logical interpretation of section 546(a) is that the statute of limitations begins running from the date the first trustee is appointed and that all subsequent trustees are subject to the same statute of limitations." *In re San Joaquin Roast Beef,* 7 F.3d 1413,. 1415 (9th Cir.1993). The Code clearly states that a trustee appointed under section 702 of the Code has until two years after that appointment to commence an action under Sections 544, 545, 547, 548, or 553.

In *San Joaquin,* a chapter 11 trustee was appointed approximately 11 months after the case was filed. Approximately one year later, the case was converted to one under chapter 7 and a chapter 7 trustee appointed. One year after that, the chapter 7 trustee filed an avoidance action against the FDIC. The FDIC objected on the grounds that the chapter 7 trustee was time barred from bringing the action. The Ninth Circuit held that the chapter 7 trustee's avoidance action was time barred, because the statute of limitations began to run with the appointment of the first trustee, the chapter 11 trustee.

---

7. Some of the cases which held that the time began to run anew upon appointment of a trustee include: *Hovis v. United Screen Printers, Inc. (In re Elkay Industries, Inc.),* 167 B.R. 404 (D.S.C.1994); *Roberts v. Seneca Petroleum Co., Inc. (In re Wikel Manufacturing Co., Inc.),* 153 B.R. 183 (Bankr.N.D.Ohio 1993); *Daff v. Regal Recovery Inc. (In re Continental Capital & Credit, Inc.),* 158 B.R. 828 (Bankr.C.D.Cal.1993); *Gorman v. Adolfo, Ashford, Bronzini, Robert Bruce,* *Chartwell Ind., (In re Racusins, Inc.),* 169 B.R. 100 (Bankr.M.D.Pa.1994); *Nigro v. Pittsburgh Post–Gazette (In re The Appliance Store, Inc.),* 171 B.R. 525 (Bankr.W.D.Pa.1994); *French v. F.A. Kohler Co. (In re Fisher),* 162 B.R. 474 (Bankr. N.D.Ohio 1993); *Sapir v. Green Forest Lumber Ltd. (In re Ajayem Lumber Corp.),* 145 B.R. 813 (Bankr.S.D.N.Y.1992); *Grabscheid v. Knox Metals Corp. (In re Luria Steel and Trading Corp.),* 168 B.R. 913 (Bankr.N.D.Ill.1994).

The decision in *San Joaquin* was rendered after the Ninth Circuit had decided *Upgrade Corp. v. Gov't Technology Services (In re Softwaire Centre International, Inc.),* 994 F.2d 682 (9th Cir.1993). Significantly, although the issue before the *San Joaquin* court was whether the statute of limitations begins to run anew upon appointment of a second trustee, that court did not find that the statute of limitations started to run with the filing of the chapter 11 petition. Instead it held that the statute began to run with the appointment of the first trustee.

Read together, the decisions in the Ninth Circuit hold that under Section 546(a), two distinct limitations periods exist. "A debtor in possession gets two years from the date of filing the case. All trustees get two years from the date the first trustee was appointed." *Iron–Oak Supply Corp. v. NIBCO, Inc. (In re Iron–Oak Supply Corp.),* 162 B.R. 301, 306 (Bankr.E.D.Cal.1993). This reasoning was applied in the *England v. Nestle Food Co. (In re California Canners and Growers),* 172 B.R. 941 (N.D.Cal.1994), a case with facts close to those here.[8]

In *California Canners and Growers,* the Debtor filed under chapter 11. Approximately seven years later, the case was converted to one under chapter 7 and a trustee was appointed. Within two years, the trustee commenced an action to recover payments. The bankruptcy court dismissed the preference action, finding that the statute of limitations began to run at the time the case was filed and not when the trustee was appointed. On appeal, the district court reversed the bankruptcy court citing *Softwaire Centre* and *San Joaquin,* as well as *Iron Oak Supply Corp. v. NIBCO, Inc. (In re Iron–Oak Supply Corp.),* 162 B.R. 301 (Bankr. E.D.Cal.1993), "[t]he logical reconciliation of *Softwaire Centre* and *San Joaquin Roast Beef* is, under the proposition that the statute of limitations pursuant to section 546(a) begins to run with the filing of a chapter 11 petition, unless a trustee has been appointed, whereby the statute of limitations runs with the appointment of the trustee." *England v.*

*Nestle Food Co. (In re California Canners and Growers),* 172 B.R. 941, 943 (N.D.Cal. 1994). See also, *Hirsch v. Marinelli (In re Colonial Realty Co.),* 168 B.R. 506 (Bankr. D.Conn.1994); *Gillman v. Swire Pacific Holdings, Inc. (In re D–Mart Servs., Inc.),* 138 B.R. 985 (Bankr.D.Utah 1992); *Daff v. Regal Recovery Inc. (In re Continental Capital & Credit, Inc.),* 158 B.R. 828 (Bankr. C.D.Cal.1993); and *Sapir v. Green Forest Lumber Ltd. (In re Ajayem Lumber Corp.),* 145 B.R. 813, 817 (Bankr.S.D.N.Y.1992).

This outcome is also supported by the policy considerations underlying Section 546(a).

> Since debtors in possession are often comprised of the same persons who are insiders of the debtor, there is a stronger possibility of fraudulent conveyances where the insiders can defeat avoidance actions simply by sitting on claims for at least two years. The avoidance powers of the bankruptcy trustee could then be circumvented by the very persons who are the most likely recipients of fraudulent conveyances.

*England v. Nestle Food Co. (In re California Canners and Growers),* 172 B.R. at 944.

Additionally, DIPs and appointed trustees, especially a chapter 7 trustee, have different goals. A DIP "may be disinclined to bring preference actions against their suppliers because chapter 11 has as its purpose rehabilitation of the debtor, while the purpose of chapter 7 is to collect, and reduce to money, the property of the estate." *Sapir v. Green Forest Lumber Ltd. (In re Ajayem Lumber Corp.),* 145 B.R. 813, 817 (Bankr.S.D.N.Y. 1992). Moreover, despite:

> "1107's grant to the debtor-in-possession of most of the rights, powers, and duties of a trustee, debtors-in-possession do not behave like trustees. Under section 1104(c), a trustee is an independent, disinterested person. While the trustee may be motivated to forego preference recoveries because the trustee believes that the benefits derived outweigh the losses therefrom, a debtor-in-possession's cost benefit analysis

---

8. This interpretation is also in line with the 1994 amendment to section 546(a) of the code which provides for two distinct time periods. The first is that the DIP has two years from the date of the filing, and the second is that the first trustee appointed has from year from the appointment to bring an action as long as that trustee was appointed within the first two years of the case.

is often more complicated and influenced by real or 'potential' conflicts of interest."

*Grabscheid v. Knox Metals Corp. (In re Luria Steel and Trading Corp.),* 168 B.R. 913, 917 (Bankr.N.D.Ill.1994).

Therefore, the Defendants' motion for summary judgment on the issue of statute of limitations is denied, and the Trustee's motion on the same issue is granted.

### C. Standing of the Trustee Under § 544(b)

#### 1. 544(b)

The Defendants allege that the Trustee cannot maintain a cause of action under section 544(b) because he cannot name a single unsecured creditor who has standing to bring this proceeding. They base their assertion on the fact that in the original complaint, the Trustee based his standing on the presence of "unsecured creditors of Kayser–Roth and/or its subsidiaries that continued to be unsecured creditors of Wingspread and/or its subsidiaries." Subsequent to the filing of the complaint, however, Paramount served interrogatories asking the Trustee to identify the creditors alleged in the complaint. The Trustee identified "(i) those unsecured creditors included in the Debtors' schedules of unsecured creditors; and (ii) those unsecured creditors listed on Debtors' unsecured creditors registers." Those schedules and registers list nearly 2,000 unsecured claims. In addition, while arguing that he had no obligation to do so, the Trustee listed certain specific creditors, including trade creditors.

In response to the Defendants' claim that the Trustee has not set forth a single unsecured creditor of the Debtors into whose shoes he may step, the Trustee first maintains that in order to invoke section 544(b), he is not required to allege the existence of an unsecured creditor whose claim existed at the time of the buyout, but rather that he need only prove at trial the existence of an actual unsecured creditor who would be entitled to avoid the transfer under applicable state or federal law and second, the Listed Creditors that have been identified would have standing to avoid the buyout.

Section 544(b) of the Code states:

(b) The trustee may avoid any transfer of an interest of the debtor in property or any obligation incurred by the debtor that is voidable under applicable law by a creditor holding an unsecured claim that is allowable under section 502 of this title or that is not allowable only under section 502(e) of this title.

11 U.S.C. § 544(b)

 In order for a trustee to maintain an action for avoidance of a fraudulent conveyance, the trustee must show that at least one of the present unsecured creditors of the estate holds an allowable claim, against whom the transfer or obligation was invalid under applicable state or federal law. 5 COLLIER ON BANKRUPTCY ¶ 544.03[1], at 544–20 (15th ed. 1994). *Moore v. Bay,* 284 U.S. 4, 52 S.Ct. 3, 76 L.Ed. 133 (1931); *In re Newman,* 11 B.R. 628, 633 (Bankr.S.D.N.Y.1981) *aff'd,* 15 B.R. 658 (S.D.N.Y.1981). Therefore, the rights of the trustee to avoid a transfer are completely derivative of those of an actual unsecured creditor. The trustee not only must show that the conditions of the state law have been satisfied, but also that, at the time that the transaction at issue occurred, there was in fact a creditor in existence who was holding an allowed unsecured claim, and second, that the transaction could have been avoided by such creditor under applicable state law. *In re Tryit Enterprises,* 121 B.R. 217, 222 (Bankr.S.D.Tex.1990); *In re Morse Tool, Inc.,* 148 B.R. 97, 131 (Bankr.D.Mass. 1992). *See, e.g., Wieboldt Stores, Inc. v. Schottenstein,* 94 B.R. 488, 506 (N.D.Ill.1988). The creditor, however, need not have reduced his claim to a lien or judgment. *In re Hecht,* 51 B.R. 72, 76 (Bankr.D.Vt.1985). In addition, implicit in the trustee's avoidance powers is a limitation that the trustee may assert a cause of action under section 544(b) only if the benefits of the action inure to all creditors ratably. *Hirsch v. Marinelli (In re Colonial Realty Co.),* 168 B.R. 506, 510 (Bankr.D.Conn.1994).

 The specific issue with which I must deal is whether the mere allegation of various unsecured creditors is sufficient to invoke section 544(b), or whether the Trustee must allege the existence of a specific unsecured creditor who would have standing to

bring the action. The Trustee contends that even though he has listed the names of various unsecured creditors who would have standing to avoid the transfer, he is not required to do so because Section 544(b) is not limited to instances where there exists an actual unsecured creditor at the time of the transfer to be avoided. In support of this contention, he relies on the cases of *Wedtech Corp. v. Nofziger (In re Wedtech)*, 88 B.R. 619 (Bankr.S.D.N.Y.1988) and *Wedtech Corp. v. Denlinger (In re Wedtech Corp.)*, 121 B.R. 286 (Bankr.S.D.N.Y.1990). However, in both of those cases, the trustee in invoking Section 544(b) was doing so in reliance upon New York Business Corporation Law § 720(b), which specifically allows a trustee in bankruptcy to bring the proceeding on his own behalf rather than requiring him to succeed to the rights of an actual unsecured creditor. Therefore, it was not incumbent upon the trustee in those cases to allege the existence of an unsecured creditor who could have brought the proceeding. The Defendants contend that the Trustee must name an actual unsecured creditor who would have standing to challenge the transfer. I agree. *Schaps v. Bally's Park Place, Inc.*, 58 B.R. 581 (E.D.Pa.1986) *aff'd*, 815 F.2d 693 (3d Cir.1987) "[B]efore a trustee is able to utilize applicable state or federal law referred to in Section 544(b), there must be an allegation and ultimately a proof of the existence of at least one unsecured creditor of the Debtor who at the time the transfer occurred could have, under applicable local law, attacked and set aside the transfer under consideration." *In re Smith*, 120 B.R. 588, 590 (Bankr. M.D.Fla.1990).

### 2. The Alleged Creditors

 The first group of creditors, on which the Trustee has relied in bringing this proceeding, are the "trade creditors of Kayser–Roth and/or subsidiaries ..." (Kaplan Aff. Ex. 16). It appears that there may be hundreds of creditors who fit this category, and, indeed, one of those creditors may have the requisite standing to allow the Trustee to assert his cause of action. However, there are factual issues to be resolved. The question, therefore, is not appropriate for summary judgment.

In considering a motion for summary judgment, "the court's responsibility is not to resolve disputed issues of fact but to assess whether there are any factual issues to be tried, while resolving ambiguities and drawing reasonable inferences against the moving party." *Cartier v. Lussier*, 955 F.2d 841, 845 (2d Cir.1992); *Knight v. U.S. Fire Insurance Co.*, 804 F.2d 9, 11 (2d Cir.1986), *cert. denied*, 480 U.S. 932, 107 S.Ct. 1570, 94 L.Ed.2d 762 (1987). In addition, it also appears that there are factual issues concerning some of the fourteen creditors listed by the Trustee. One such dispute exists over whether one of the trade creditors, Taffeta, is, in fact, an unsecured creditor. The Defendants claim that Taffeta was paid, but offer no evidence to support their conclusion.

Therefore, at trial, the Trustee must prove the existence of at least one unsecured creditor who, at the time the transfer occurred, could have, under applicable local law, attacked and set aside the transfer under consideration. *In re Smith*, 120 B.R. 588, 590 (Bankr.M.D.Fla.1990).

The motions of both the Defendants and the Trustee for summary judgment on the issue of standing are denied.

Parties are directed to settle an order.

Counsel shall appear before me on February 16, 1995 at 9:30 a.m. for a status conference.